FILED

2014 Aug-27  AM 11:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GARY R. DOWNS,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:13-cv-365-JHH** |
| **MR. BURCH FORMAL WEAR, INCORPORATED; and WAYNE A. BURCH,** | ) | |
| **DEFENDANTS.** | ) | |

## MEMORANDUM OF DECISION

The court has before it Defendants Mr. Burch Formal Wear, Incorporated and Wayne A. Burch's June 5, 2014 Motion (Doc. # 13) for Summary Judgment. Pursuant to the court's June 5, 2014 order (Doc. # 16), the Motion was deemed submitted, without oral argument, on July 11, 2014. After careful consideration of the briefs and evidence before the court, the Motion (Doc. #13) for Summary Judgment is due to be granted for the following reasons.

## I. Procedural History

Plaintiff commenced this action on February 25, 2013 by filing a Complaint (Doc. #1) in this court alleging violations of the Family and Medical Leave Act

1

(FMLA), 29 U.S.C. §2601 et seq., as well as a claim under Alabama law for "mental and emotional distress."   With regard to the FMLA specifically, Plaintiff contends that he was "unlawfully terminated as a result of his former employer's violations under FMLA including willful interference and retaliation by his former employer."   (Compl. ¶ 4.)   Defendants' Motion for Summary Judgment asserts that Plaintiff has failed to present evidence from which a reasonable jury could conclude that Defendants violated the FMLA.

Both parties have filed briefs and submitted evidence in support of their respective positions.   Defendants submitted a brief (Doc. # 14) and evidence[1] (Doc. # 15) in support of their own motion for summary judgment on June 3, 2014. On June 17, 2014, Plaintiff filed a brief and evidence[2] (Doc. # 17) in opposition to Defendants' Motion for Summary Judgment.   On June 10, 2014, Defendants filed

---

[1] Defendants submitted the following evidence in support of summary judgment: deposition of Plaintiff; letter from Mr. Burch to Plaintiff; affidavit of Barbara McCollum; email between Barbara McCollum and Blue Cross Blue Shield; COBRA Continuing coverage letter; Check from Mr. Burch to Plaintiff; work status report from Dr. Turnley; return to work report from Dr. Routman; letter from attorney Joshua Wilson to Mr. Burch; letter from attorney Bret Gray to attorney Joshua Wilson; Social Security Administration Function Report of Plaintiff; Social Security Work History Report for Plaintiff.

[2] Plaintiff submitted the following evidence in opposition to summary judgment: deposition of Wayne A. Burch; letter from U.S. Department of Labor to Plaintiff; Notice of Corrective Action; Mr. Burch Policies and Procedures and Acknowledgment by Plaintiff; Revised Employee Handbook; COBRA Election letter; 5/27/11 and 6/2/11 emails from Plaintiff to Barbara McCollum; 6/6/11 letter from attorney Joshua Williams to Defendant; 6/11/11 email from Plaintiff to Joshua Williams; email chain between Dean Beharry and Plaintiff; audio production of a conversation between Plaintiff and Burch.

a brief (Doc. # 18) in reply to Plaintiff's opposition.    All briefs and evidence have

been considered by the court in making its determination.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229

F.3d 1012, 1023 (11th Cir. 2000).   The party asking for summary judgment

always bears the initial responsibility of informing the court of the basis for its

motion and identifying those portions of the pleadings or filings which it believes

demonstrate the absence of a genuine issue of material fact.   See id. at 323.

Once the moving party has met its burden, Rule 56(e) requires the nonmoving

party to go beyond the pleadings and by its own affidavits, or by the depositions,

answers to interrogatories, and admissions on file, designate specific facts showing

that there is a genuine issue for trial.   See id. at 324.

The substantive law will identify which facts are material and which are

irrelevant.   See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   All

reasonable doubts about the facts and all justifiable inferences are resolved in favor

of the non-movant.   See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   Anderson, 477 U.S. at 248.   If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.   See id. at 249. The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.   See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).   If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.   See Fitzpatrick, 2 F.3d at 1115.   Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.   First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.

4

Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.   The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.   This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.   <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115-16.   If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.   However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.   <u>See</u> <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

**III. Relevant Undisputed Facts**[3]

Plaintiff Gary R. Downs began his employment with Defendant Mr. Burch Formal Wear, Incorporated ("Mr. Burch") in February 2002 as a Plant Manager over the dry cleaning at Mr. Burch's Vestavia, Alabama location.   (Downs Dep.at 14-15.)   In 2004, Downs was moved to the downtown Birmingham, Alabama location and became Plant Manager of that location.   (Id. at 16.)

As Plant Manager of the downtown location, Downs supervised approximately 20 to 22 employees.   (Id. at 17.)   He was responsible for making the schedules of those 20 to 22 employees and keeping track of their vacation time. (Id. at 19.)   His other duties included procedures related to cleaning and operating the dry cleaners, handling the clothes, customer complaints, and any duties asked of him related to the formal wear side of the business.   (Id. at 17.)   Downs also performed maintenance tasks involving, among other things, issues related to the boiler, which was often in disrepair.   (Id.)

As far as physical duties, Downs was occasionally required to lift a 200 gallon drum onto a dolly, and he would have help with this task.   (Id. at 19-20.) On a more regular basis, Downs was required to lift boxes of hangers which

---

[3]   If the facts are in dispute, they are stated in a manner most favorable to the non-movant. See Fitzpatrick, 2 F.3d at 1115.

weighed approximately 20 pounds and carry bundles of clothes to customer vehicles.  (<u>Id.</u> at 20-21.)   He was also required to stand, sit, kneel, crouch, crawl and stoop.   (<u>Id.</u> at 100-01.)   In a normal work week, Downs worked approximately 45 hours a week, but during prom season,[4] the busy season, Downs worked approximately 65 hours a week.   (<u>Id.</u> at 30-31.)

## A.  The Accident

On February 23, 2011, sometime between 11:00 and 11:30 a.m., Downs was making his regular routine run of the dry cleaning area, or the "hot room."   (<u>Id.</u> at 24-25.)   Downs testified that "[a] lot of times we have clothes that fall off of the hangers up on the conveyor, at the top of the conveyor," so he went out on a clothing conveyor to see if any clothes had fallen off.   (<u>Id.</u>)   Downs stated that "when you go up in that area you can looks down and look underneath the bundles and look on the floor and see if there is anything there" that has fallen from the conveyor.   (<u>Id.</u> at 25.)   Downs saw that there were items on the floor, so he walked down the middle of two conveyors.   (<u>Id.</u>)   When he got to the end, Downs picked up an item and fell backwards, hit a part of the conveyor, and landed on the floor.   (<u>Id.</u> at 25-16.)   Downs testified that he fell approximately 20 feet.   (<u>Id.</u> at 26.)   As a result, Downs suffered fractures in five vertebrae and

---

[4] Downs testified that prom season was roughly between March and May or June. (Downs Dep. at 30.)

sustained head trauma.   (<u>Id.</u>)   Downs was taken to the hospital and released two or three days later.   (<u>Id.</u> at 29.)

Following the accident, Barbara McCollum, the Human Resources Manager, filled out Downs' First Report of Injury and notified the workman compensation carrier.   (<u>Id.</u> at 28-29.) Additionally, after McCollum realized that Downs had sustained an injury that constituted a serious health condition that would require him to be out of work for more than 3 consecutive days, Downs was placed on Family Medical Leave.   (McCollum Aff. ¶¶ 3-4.)   There is no evidence that Downs was notified by Mr. Burch that he was being placed on Family Medical Leave.

Following his release from the hospital, Downs was under the care of several doctors.   At first he did not get out of bed "for a while," but then he had a cane and a walker to assist him in getting around.   (Downs Dep. at 32.)   A physical therapist came to Downs' house to work with him.   (<u>Id.</u>) Downs testified that Dr. Michelle Turnley was one of his doctors, who he saw as a result of his workman's compensation claim.   (<u>Id.</u> at 32-34.)   He also saw Dr. Routman, an ENT specialist, who Downs saw for his head injury and resulting dizziness.   (<u>Id.</u> at 68-69.)

**B.   Downs Reports Accident to OSHA**

Sometime shortly after the accident, Downs filed a formal complaint with the Occupational Safety and Health Administration (OSHA) regarding the alleged unsafe conditions which led to his injuries.   (See Pl. Exh. 2.)   In response to that complaint, OSHA conducted an inspection of Mr. Burch's downtown cleaners. (Id.)   The inspection began on March 20, 2011 and was completed on April 21, 2011.   (Id.; see also Pl. Exh. 3.)   As a result of Downs' complaint and the investigation, Mr. Burch received a citation because "employees are exposed to a 12 foot fall hazard as a result of an unguarded ledge on the second floor."   (Pl. Exh. 2.)   Mr. Burch was fined $4900.00 for this "serious" citation.   (Pl. Exh. 3.) Mr. Burch took all necessary corrective action, including installing a railing, to remedy the citation.   (Id.)

**C.   Insurance Issues After the Accident**

On March 4, 2011, Mr. Burch sent Downs a letter informing him that his group health insurance policy with Blue Cross Blue Shield and his Delta Dental insurance policy would continue, and he was to contribute his portion of the premium, just as he had been doing while at work, in the amount of $43.80.   (Def. Exh. 2.)

On April 19, 2011, McCollum contacted Blue Cross Blue Shield regarding

9

Downs's coverage under the policy while he was out on leave.   (McCollum Aff. ¶ 5.)   McCollum spoke with Kelly Penny, a Blue Cross Blue Shield Customer Accounts Representative, and later received an email from Penny stating that Downs would have to come off of the regular group policy and would be placed on COBRA beginning May 1, 2011, until he was able to return to work.[5]   (Id. at ¶¶ 5-6; Def. Exh. 4.)   As a result of this conversation, on April 22, 2011, McCollum sent Downs a COBRA continuation of coverage election letter.   (Def. Exh. 5.)

After receiving the letter, Down contacted McCollum, and the situation was explained to him.   (Downs Dep. at 53.)   Downs remained under the same insurance policy for the months of February, March and April 2011, and contributed his portion of the premium just as he had been doing before his leave. (Id. at 54-55.)   In May 2011, Downs was placed on COBRA, and Downs paid the premium of $848 for the month of May.   (Id. at 56.)   On June 9, 2011, however, Mr. Burch reimbursed Downs in the amount of $807.84, which represented the difference between the $43.90 premium he contributed towards his insurance premium and the more expensive COBRA premium.   (Id. at 58-59; Def. Exh. 6.) This payment and reimbursement continued throughout his leave.   (See Downs Dep. at 47-48; 63-64.)   Downs confirmed in his deposition that from the date or

---

5 Blue Cross requires employees to work a minimum of 32 hours to be eligible for coverage.   (Doc. # 14 ¶ 19.)

his accident through November 2011, he did not incur any medical bills that were not covered by his insurance policy and that he did not have to pay any bills out of pocket.   (Id. at 47-48.)

## D.   Downs's Attempt to Return to Work and Request for FMLA Leave

During Downs's leave, his position remained open, and Mr. Burch hired a temporary employee to cover for him until his return.   (McCollum Aff. ¶ 8.) Downs' twelve weeks of Family Medical Leave expired on May 18, 2011.   (Id. ¶ 9.)   Following the expiration of his leave, McCollum testified that "a decision was made that due to business necessity a full time plant manager would need to be hired to fill his position permanently."   (Id. ¶ 9.)

On May 23, 2011, Downs visited Dr. Turnely and received a return to work release form.   Dr. Turnley released Downs for work on May 31, 2011, with the following restrictions: four hour days for two weeks with full schedule thereafter; and not working at elevations.   (Downs. Dep. at 65-67; Def. Exh. 7.)   Dr. Routman also released Downs to return to work on May 31, 2011, with the restrictions of "no climbing on ladders or elevated platforms, no working to reach above head."   (Def. Ex. 8.)

A few days after receiving his limited return to work, on May 27, 2013, Downs called McCollum at Mr. Burch to talk about his limited work release

11

received from the doctors, and inquired about return to work. (Pl. Exh. 7.)
McCollum told Downs that there was not any light duty work available, and that
his position had been filled because he was not able to return to full duty work.
(Id.)   After that conversation, Downs sent an e-mail to McCollum recounting the
above conversation (including the portion that his position had been filled), but
then requesting FMLA leave for two weeks until he was "eligible to return to full
duty." (Id.)   When Downs did not receive a response from McCollum, (Downs
Dep. at 74-75), on June 2, 2011, he re-sent the same email to McCollum, again
requesting FMLA leave. (Pl. Exh. 8.)

On June 3, 2011, Downs retained an attorney. (Downs Dep. at 76.)   Three
days later, on June 6, 2011, Downs's attorney wrote a letter to Burch and
McCollum. (Pl. Exh. 9.)   The letter stated that the attorney had been retained by
Downs related to a claim under the FMLA and again requested that Mr. Burch give
Downs leave under the FMLA until he could return to full-time duty. (Id.)   On
June 9, 2011, counsel for Defendants responded to that letter, stating that Downs'
position was held for twelve weeks, but due to his inability to return to work on a
full-time basis without restriction after twelve weeks, business necessity dictated
that his position be permanently filled. (Def. Exh. 10.)

On Saturday, June 11, 2011, Downs went to Mr. Burch Formal Wear and

12

spoke with Wayne Burch.   (Downs Dep. at 83-84.)   Downs told Burch that he had a release to come back to work and that under that release he could come back to full duty work on Monday, June 13, 2011.   (Id. at 84; Pl. Exh. 10.)   According to Downs, Burch refused to look at the release, told Downs that he needed to talk to his lawyer, and informed him not to report to work on Monday.   (Id.)   Downs accuses Burch of becoming very agitated during the conversation, raising his voice loudly, especially in regards to the OSHA complaint, and telling Downs to "sue me."   (Id.)

**E.   Social Security Disability**

In December 2011, Downs filed an application to receive Social Security Disability.[6]   (Downs Dep. at 89.)   As part of the application process, Downs indicated that he was unable to lift any amount of weight over a few pounds, was unable to sit or stand for long periods of time, unable to finish tasks that he started, unable to bend much, cannot push, pull, stand, lift or bend, not good in heat, unable to pay bills, and cannot concentrate.   (Id. at 96-98; Def. Exh. 11.)   Downs told the Social Security Administration that he was unable to do his job at Mr. Burch from February 23, 2011, continuing through December 2011.   (Downs Dep. at

---

6 Downs acknowledged in his deposition that all the information he provided to the Social Security Administration related to his disability was all related to his injury he sustained on February 23, 2011.   (Downs Dep. at 95-96.)

104-05.)

## IV. Applicable Substantive Law and Analysis

Before the court addresses Plaintiff's claims under the FMLA, the court first disposes of Plaintiff's claim for "mental and emotional distress" which is Count III of his Complaint.   Defendant convincingly argues that under the standards set forth by the Supreme Court of Alabama, Plaintiff's allegations fall well short of the kind of conduct required to succeed on such a claim.   (Doc. # 14 at 20-21.) Moreover, Plaintiff does not address this claim in any part of his brief in opposition to the motion for summary judgment.   Therefore, the court deems it abandoned and summary judgment is due to be granted in favor of Defendants on Plaintiff's claim for mental and emotional distress.

The court now gets to the heart of the matter – Downs's claims under the FMLA.   The FMLA holds an employer[7] liable "who interferes with or denies any rights provided to an employee" under the FMLA Wascura v. Carver, 169 F.3d

---

[7]   An employer is defined in relevant part to include "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I). By virtue of this definition, the Eleventh Circuit has held that "individuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the" FMLA. Wascura, 169 F.3d at 686; see also 29 C.F.R. § 825.104(d). A corporate officer is individually liable if he is "involved in the day-to-day operation [of a facility or of the corporation's functions, "including compensation of employees or other matters 'in relation to an employee' "] or [has] some direct responsibility for the supervision of the employee ." See Patel v. Wargo, 803 F.2d 632, 638 (11th Cir.1986).   As such, based on the allegations in the Complaint and considering the evidence before the court on summary judgment, Defendant Wayne A. Burch may be sued in his individual capacity as an "employer" under the FMLA.

14

683, 685 (11th Cir.1999) (citing 29 U.S.C. § 2617(a)), or who "intentionally discriminates against him in the form of an adverse employment action for having exercised an FMLA right."   Strickland v. Water Works & Sewer Bd. Of the City of Birmingham, 239 F.3d 1199, 1207 (11th Cir. 2001).   The FMLA entitles eligible employees to 12 weeks of leave during any 12–month period for a serious health condition. 29 U.S.C. § 2612(a)(1)(D).   Following a period of FMLA leave, an employee has the right to be restored to his original position or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." Id. § 2614(a)(1). When an employee cannot perform an essential function of his original "position because of a physical or mental condition, including the continuation of a serious health condition," he "has no right to restoration to another position." Id. § 825.216(c). "An employee is 'unable to perform the functions of the position' where the health care provider finds that the employee is unable to work at all or is unable to perform any one of the essential functions of the employee's position."   Id. § 825.123(a).

To protect an employee's rights, the FMLA created two types of claims – "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which the employee asserts that his employer discriminated against him

15

because he engaged in activity protected by the Act." Strickland, 239 F.3d at 1206. Downs brings both types of claims. The court discusses each one separately below.

## A.   Interference Claim

To establish an interference claim under the FMLA, "an employee must demonstrate that he was denied a benefit to which he was entitled under the FMLA." Martin v. Brevard Cnty. Pub.Sch., 543 F.3d 1261, 1266-67 (11th Cir. 2008); see also Wascura, 169 F.3d at 685. Downs contends that Defendants interfered with his rights under the FMLA when Defendants failed to notify Downs that they were counting his leave under the FMLA and failed to provide him with the required paperwork.

As explained above, the FMLA provides that, in qualifying circumstances, "an eligible employee shall be entitled to a total of 12 workweeks of leave." 29 U.S.C. § 2612(a)(1) (emphasis added). The statute also grants employers the right to require employees "to substitute any of the accrued paid vacation leave, personal leave, or family leave of the employee for leave provided under [the FMLA]. Id. § 2612(d)(2)(B). Therefore, if Downs was terminated (or his position was not available for him to return to) "after []he received twelve weeks of leave – be it paid or unpaid, personal or family, vacation or medical" – his

16

interference claim under the FMLA is not viable.   Dixon v. Public Health Trust of Dade County, __ Fed. Appx. __, 2014 WL 2210579, at * 2 (May 29, 2014) (citing Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 96 (2002); McGregor v. Autozone, Inc., 180 F.3d 1305, 1308 (11th Cir. 1999) ("The statute provides for only 12 weeks of leave.").

According to the undisputed evidence before the court, Downs was injured on Wednesday, February 23, 2011.   As such, his twelve weeks of FMLA leave ended on Wednesday, May 19, 2011, and Defendants were not required under the FMLA to hold his job open for him beyond that point.   It is undisputed that Downs did not return to work at the expiration of twelve weeks – in fact, the evidence shows that Downs did not even have a release to return to any type of work until May 31, 2011, and that was a release only for "light duty" and not to his previous position or an equivalent position.   Moreover, Downs testified that he was unable to return to work from February 23, 2011 through May 31, 2011, and that even as of the date of his deposition on January 3, 2014, he remained physically unable to perform all the functions of his job.   (Downs Dep. at 85-86, 87, 117.)

Additionally, the court rejects Downs's claim that Defendants violated the FMLA when it failed to notify Downs that his leave qualified as FMLA leave.

17

The Eleventh Circuit explicitly rejected such an understanding of the FMLA in
McGregor v. Autozone, 180 F.3d 1305 (11th Cir. 1999). The question before the
Eleventh Circuit in McGregor was the essentially the same as presented by
Plaintiff here: whether an employer's failure to notify an employee that her paid
leave was running concurrently with the FMLA leave created a windfall for the
plaintiff, such that she could increase the twelve week FMLA leave of absence by
the time she was on the paid leave of absence. The Eleventh Circuit answered no.

To resolve the dispute in McGregor, the Eleventh Circuit assessed the
validity of an FMLA regulation, 29 C.F.R. § 825.208, which required an employer
to notify an employee that her absence is being counted as FMLA leave before the
absence can be charged against the twelve week entitlement. 180 F.3d at 1307. The
Court held that this FMLA regulation was invalid and unenforceable because it
was "manifestly contrary to the [FMLA] statute." Id. at 1308. Specifically, the
regulation had the practical effect of converting the FMLA statute's minimum of
federally mandated unpaid leave into an entitlement to an additional twelve weeks
of leave unless the employer prospectively notified the employee that she is using
her FMLA leave. The Eleventh Circuit unequivocally stated that the FMLA
provides "for only twelve weeks of leave . . . [and] does not suggest that the twelve
week entitlement may be extended." McGregor, 180 F.3d at 1308.   Therefore, the

18

Eleventh Circuit concluded that the employer acted appropriately when it exercised its statutory right to require plaintiff to run her accrued paid leave contemporaneously with the twelve weeks of FMLA leave, even though the employer did not give notice to the employee of this calculation. Id.

McGregor controls Downs's claim in this case.   Under the precedent in the Eleventh Circuit, Defendants had the statutory right to count Downs's leave against his twelve-week FMLA guarantee and was not obligated to notify him in advance that it would exercise that right.   See id.; Strickland, 239 F.3d at 1205. Simply put, the FMLA guaranteed Downs a total of twelve weeks of leave and no more.   How Defendants characterized Downs's leave is irrelevant and whether Defendants told him how they were characterizing his leave is irrelevant as well. Because the undisputed evidence shows that he received twelve weeks of leave before his position was permanently filled, Downs's interference claim under the FMLA fails.

**B.   Retaliation Claim**

To succeed on an FMLA retaliation claim, an employee must demonstrate that the employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right. Strickland, 239 F.3d at 1207. In the absence of direct evidence, the court applies the McDonnell Douglas

19

burden-shifting framework. <u>Id.</u> To establish a prima facie case of retaliation under the FMLA, a plaintiff must show that (1) he engaged in statutorily protected conduct, (2) he suffered an adverse employment action, and (3) there is a causal connection between the protected conduct and the adverse employment action. <u>Id.</u> After the plaintiff establishes a prima facie case, the employer must provide a legitimate, nondiscriminatory reason for the adverse action. <u>Schaaf v. Smithkline Beecham Corp.</u>, 602 F.3d 1236, 1243 (11th Cir. 2010). If the employer does so, then the plaintiff has the burden of proving that the reason was merely pretext for retaliation.   <u>Id.</u> at 1244.   To survive summary judgment, specific facts showing pretext are needed; "[m]ere conclusory allegations and assertions will not suffice." <u>Earley v. Champion Int'l Corp.</u>, 907 F.2d 1077, 1081 (11th Cir.1990).

No genuine issue of material fact exists as to whether Defendants retaliated against Plaintiff for taking FMLA leave.   Even if Downs established a prima facie case,[8] he has failed to present any evidence that Defendants terminated him because he took FMLA leave.   In fact, the evidence shows that the opposite is true.   Defendants gave him the required twelve weeks off of work under the FMLA and his position was open for him to come back and resume work at the

---

8 The court has serious reservations as to whether Downs established a prima facie case, but does not need to make a decision regarding this issue because it is so clear that he cannot establish pretext.

expiration of those twelve weeks.   It is undisputed, however, that Downs was unable to perform the all functions of his position at the expiration of the twelve weeks.    At that point, Defendants were no longer required to hold his position open.

Downs's arguments regarding his requests for FMLA leave in late May and early June are unavailing.     By the time he asked for FMLA leave, the twelve weeks required under the statute had already expired.   As discussed in detail above, Defendants were not required to grant Downs any more leave after those twelve weeks ran out.   Evidence of Burch's anger toward Downs after his termination and/or any evidence regarding the OSHA investigation are irrelevant to establish intentional retaliation under the FMLA.   As such, his claim of retaliation under the FMLA fails.

## V.   Conclusion

For the reasons discussed above, the court finds that no material issues of fact remain and that Defendants are entitled to judgment as a matter of law as to all claims asserted by Plaintiff in the Complaint.    A separate order will be entered.

**DONE** this the 27th day of August, 2014.

James H. Hancock

_____

SENIOR UNITED STATES DISTRICT JUDGE